AT A SPECIAL SESSION HOLDEN AT COLUMBUS, DEC., 1829.

---

## LESSEE OF LUDLOW'S HEIRS *v.* CULBERTSON PARK.

When a case is reserved on the circuit, the facts material to its decision should be drawn up in writing, approved by the court, filed among the papers, and sent with them to the court in bank.

An order of court authorizing administrators to sell the real estate of their intestate, made subsequent to the sale, can not be given in evidence to sustain such sale.

Where, at the trial, evidence offered is rightly rejected, but an incorrect reason assigned for such rejection by the court, it is no ground for a new trial.

An order of court authorizing administrators to sell intestates' real estate, excepting that of a specified character, can not be given in evidence to sustain a sale of any of the lands excepted from its operation by its terms.

In a motion for a new trial, upon account of newly discovered evidence, the evidence must be disclosed, and the motion granted or refused, according as the court may suppose such evidence affects the justice of the case.

THIS was an ejectment, tried before the Supreme Court, in Hamilton county, in which a verdict was founded for the plaintiff, and a motion was made by the defendant for a new trial, which motion

was adjourned here for decision.   The case upon the trial appeared as follows :

The plaintiff proved that the lessors were the heirs at law of Israel Ludlow, who died in January, 1804, intestate.   A deed from J. Cleve Symmes to Israel Ludlow, for the premises in dispute, was adduced in evidence, with proof of the possession and occupancy of Ludlow until the time of his death.   The premises were a twenty-seven acre out-lot claimed to be within the plat of the city of Cincinnati.   An official copy of the town plat was given in evidence, on which the premises were designated.   It was also proven that the premises had been improved, by clearing, inclosing, and cultivation, in the lifetime of Ludlow.   Upon these proofs, the cause was rested by the plaintiffs.

The defendant then offered in evidence a deed, from the administrators of Israel Ludlow, to himself, for the same premises.   This deed bore date on December 21, 1810, and recited that the administrators had, on the 13th of that same month, sold the premises conveyed, under an order of the court of common pleas of Hamilton county, of December term, 1810.   It was conceded that the ;6] *sale was, in fact, made on the day recited in the deed.   A certified copy of the order of sale was produced, in the following words: "December 17, 1810.   Petition of the administrators of Israel Ludlow, deceased, etc., for to sell real estate to satisfy the demands, etc., which this court grant."   The plaintiff's counsel objected to the admission of this deed and order in evidence, on the ground that the order authorizing the sale, being made subsequent to the sale itself, and that fact appearing upon the face of the deed, the sale and conveyance were inoperative for defect of authority in the administrators to make a sale.   The court sustained the objection, and rejected the deed and order.

The defendant's counsel then offered in evidence an order of the court of common pleas of Hamilton county, of May term, 1804, in the following words: "The administrators of the estate of Israel Ludlow, deceased, exhibit an account current, and pray the court to issue an order for the sale of the real property, to defray the debts due from the estate, etc.   John Ludlow and James Findlay sworn in court.   The court order so much of the real property sold as will meet the said demands, except the farm and improved lands near Cincinnati, together with the house and lots in Cincinnati."   The plaintiff's counsel objected to this order being re-

Lessee of Ludlow's Heirs *v.* Park.

ceived in evidence, because the premises in question, being improved lands near Cincinnati, or a lot in Cincinnati, were not embraced by it; and also because the law in force when the order was made, was repealed in 1805, and no law substituted for it empowering the courts to order the sales of decedents' estates, until 1808. The order was also rejected by this court, and no evidence being given to the jury, divesting the title of the plaintiff's lessors, a verdict was rendered for the plaintiff, under the direction of the court.

The defendant's counsel moved for a new trial, and assigned the following reasons :

1. The verdict is against law.

2. The verdict is against evidence.

3. The court rejected legal and proper evidence, which ought to have been given to the jury.

4. The defendant has discovered new and material evidence since the trial.

*The newly discovered evidence consisted of an old copy of [7 the plat of the city of Cincinnati, in which the twenty-seven acre out-lots were not marked as a part of the town.

The questions arising on the motion for a new trial were adjourned for decision to the special session, at Columbus. At the time of adjourning the cause, no statement was made and approved by the court, presenting the state of the case, and the questions to be discussed and decided. When the counsel came to prepare their arguments, the counsel for the defendant alleged they had been directed by the court to argue only a single point, viz: "Whether any other order could be shown than that recited in the deed." This the plaintiff's counsel denied, and insisted that the whole case was open for discussion, as presented by the facts stated to have transpired at the trial. The cause was argued by N. WRIGHT, and CASWELL & STARR, upon this point, and by HAMMOND & GARRARD upon the whole case.

N. WRIGHT, in support of the motion for a new trial :

I shall contend that the recital of one order, in a deed of this sort, does not prevent the party from relying upon any other, which may sustain his title; that the material question is, whether the administrator had in fact the power to sell, and if the power existed, a misrecital of the power, or a neglect to refer to it alto-

3

gether, will not vitiate the deed; but that the deed will be made to operate in any way in which it can be effectual, *ut res magis, valeat quam pereat,* according to the old maxim, "*quando non valet quod ago ut ago, valet quantum valere potest.*"

It will be kept in mind, that none of our statutes required the order or the proceedings to be recited in these deeds by administrators, differing in this respect from sheriff's deeds; the form of the deed, therefore, is left to common law principles.

The general principle is not questioned, that parol evidence is inadmissible to contradict or vary the effect of a written instrument; but the very language of this rule shows that it refers only to essential parts of the instrument; those parts where parol testimony would vary the effect of the instrument. An immaterial part of an instrument may be *varied or contradicted by parol; for the plain reason, that by so doing you produce no alteration in the operation of the writing. Thus the date may be contradicted, the amount of the consideration of a deed may be contradicted; if the deed recites incorrectly the prior chain of title, it is no impediment to showing the title truly; and almost all recitals may be contradicted; because recitals are not essential parts of the deed; as evidence, they are mere admissions of facts, and the truth may be generally shown. There are exceptions in relation to recitals, and the general principle is undoubted.

"A recital is not a necessary part of a deed either in law or equity. It may be made use of to explain a doubt of the intention and meaning of the parties, but it hath no effect or operation." Shep. Touch. 76, and n. 2; 2 Chan. Cas. 101.

"A recital is no estoppel, because not a direct affirmation." Co. Lit. 352, b; 9 Johns. 90.

Where the recital is essential to the operation of the deed, or where the terms are such that the grant operates only on the misrecited premises, there the recital can not be contradicted, and in such cases the general rule relative to parol evidence applies; but to an immaterial recital, it has no sort of application.

The only inquiry, therefore, in the present case, must be, whether the recital of the order is a material part of the deed. The deed is an execution of a power; and the order of court constitutes the power. It is an old and uniform common law doctrine, that a deed, made in execution of a power, need not recite the power, and that a misrecital does not vitiate it. It is so laid down in Cleer's

case, and runs through all the books. 6 Co. 18; Cro. Eliz. 877; Cro. Ja. 31; 10 Co. 143.

Cruise states the law thus: "An instrument may operate as a revocation or appointment, without any mention or recital of power. For if the act done be of such a nature that it can have no operation, except by virtue of the power, the law will resort to the power, and thereby give validity to the instrument, upon the principle that *quando non valet quod ago ut ago, valeat quantum valere potest.*" T. Raym. 295; 4 Cruise, 240.

Powell says : "It is not necessary that the deed creating the power, should be recited or referred to in the instrument *ex- [9 ecuting the power, if the act done be of such a nature that it can have no operation unless by virtue of the power; for in such case the law will refer to that, and thereby give validity to the deed." Powell Pow. 111, 126.

And the rule is the same at law in ejectment.

Sugden Pow. 292, repeats the same doctrine.

Maddock says; "It is not necessary to recite, in order to execute, a power, if it clearly appears that the party intended to execute it," and "that all these doctrines (in relation to such conveyances), relate to what are considered as legal powers over legal estates, and as such, are within the adjudication of courts of common law, nor have courts of equity any original or exclusive power to decide upon them," etc. 1 Mad. Ch. 56, 450.

In ex parte Caswall, it is said, "Though a man may execute a power, without reciting or taking the least notice of it, yet he must mention the estate," etc. 1 Atk. 560.

In Read's Lessee v. Reed, in ejectment, the same principle is held. Lord Kenyon says, relative to a will, when no reference to the power was made, "Undoubtedly the words are sufficiently comprehensive to pass this fourth, if it can be collected from the will, that the devisor intended it to pass." 8 D. & East, 121; 6 East, 105; Berkley's Lessee v. Archbishop of York.

"If deeds can not operate in one form, they shall operate by that which by law will effectuate the intention." Goodlittle & Edwards v. Baily, 2 Cowp. 600.

Lord Redesdale says, "It is not necessary that the instrument, to operate under the power, should recite the power, or refer to it in any manner, in the execution of it; but if the act can have no

effect but by virtue of the power, it is taken to be done in execution of the power." Dillon *v.* Grace, 2 Sch. & Lef. 404.

In Maundrell *v.* Maundrell, Lord Eldon says, "The authority of Sir Edward Cleer's case, as well as all general doctrine, seems to furnish this, that it is not necessary to recite that he means to execute the power, if the act is one that he can do only by that authority." This case arose on the construction and effect of legal conveyances. 10 Ves. 257.

So Chancellor Kent, " If the act can be good in no other way than by virtue of the power, the act or will shall be deemed *an execution of the power, though there be no reference to the power." Bradish *v.* Gibbs, 3 Johns. Ch. 551.

So in Jackson *v.* Pratt, in ejectment, speaking of the misrecital of an execution in a sheriff's deed, he says, " Such recital was no necessary part of the deed, and a variance would not be material nor affect the validity of the deed, so long as there was existing a sufficient power to warrant the sale." 10 Johns. 386.

So in Hatton *v.* Dew, in North Carolina, it was decided that although the execution, under which the sheriff's sale was made, was erroneously recited in the sheriff's deed, yet the deed was good. 2 Murph. 260.

So in South Carolina, in Harrison *v.* Maxwell, the sheriff's deed recited the execution under which the sale was made, as issuing from the court of one district, when in fact it issued from another district; yet it was held the deed was good, notwithstanding this misrecital. 2 Nott & McCord, 347.

So in Tennessee, in Craig *v.* Vance, it was held that a misrecital of the judgment, by virtue of which the land was sold, does not vitiate the sheriff's deed. 1 Tenn. 209.

So in Jackson *v.* Streeter, it was held that a misrecital of the judgment in the sheriff's deed is not material, provided it be proved, in fact, that the sale was made under a subsisting judgment and execution. A recital is no material part of a deed. 5 Cowen, 529.

The foregoing references, and others which might be made, show clearly the general principle, that the recital of the power is not an essential part of the deed; and that the principle is applied to the case of sheriff's deeds, with reference to the execution which constitutes the power. The case of an administrator's deed is the same in principle, but in practice there is less reason for a refer-

ence to the power. The sheriff's authority depends on the writ, the issuing of which is a ministerial act; there is no direct judicial sanction upon it; and among the multiplicity of executions, there is great opportunity for errors. Not so with the administrator; his authority is the direct order of court, referring to the administrator by name, and pointing out distinctly the act to be performed. The order always remains to show the authority; the record itself, and not a writ ministerially issued, is the substance of the power. This single power is the *only one to which [11 the act can be referred; and a mistake in the reference can be attended with no evil consequences. If there should be successive orders, they are all before the same court, perfectly united in their object, to be accounted for all as one act, and resulting in the same charge and liability of the order. If, therefore, in the case of an execution, the recital is immaterial, surely it can not be material in the present case.

It is worthy of remark that some of our statutes expressly require the recital of an execution, thereby implying that without such statutory provision the recital would be unnecessary; but none of them require the recital of the order in an administrator's deed.

In the present case, the order is recited as of December term, 1810; the only thing proposed is, to show that the date of the term only is misrecited; the same court, the same parties and subject matter, the same object; indeed, in every respect the same, except the date of the term.

Even in the case of sale on execution under our present law, would it not be a construction somewhat literal and rigorous, to say the best, to hold that a mistake in the term, at which judgment was rendered, would vitiate the sheriff's deed?

The recital does not give validity to the deed, unless the authority be otherwise shown. The order must still be produced; the recital, therefore, is of no effect, unless it be requisite on common law principles as a rule of conveyancing. It is not evidence of the order itself, and of course can work no injustice in case of misrecital. It is a rule of all conveyances, that they shall be held to operate in whatever way they can; and judges are ever astute in devising a way to make them effectual, although it be one, which the parties never contemplated, or perhaps even knew. If the intention of the parties can be effected, it matters not what rules of

7

Lessee of 'Ludlow's Heirs *v.* Park.

law may be brought into its aid. It may happen that some legal nicety, unknown to the parties, may prevent the operation of the deed in the manner intended; and so, on the other hand, it may happen that some principle of law, equally unknown, may give it validity. And thus the law is at least as effectual in sustaining, as it is in defeating, the intention of the parties. The deed shall operate *quacunque via potest;* and no principle is more universal. 12] *Suppose the principle contended for on the other side should be followed up, and applied to all administrators' deeds, and sheriffs' deeds at those periods, when the statutes did not expressly require the recital of the execution. In how many instances will it be found that the deed has misstated the term at which the execution issued or the order was made? Judging from general principles, and the analogies to be found in the books, no one would have supposed such conveyances to be utterly void; they might rely upon them with ordinary discretion at least; and we may reasonably presume, therefore, that title is much involved in the question. It will not, then, at this late day, be lightly disturbed.

If we look into the books, on the subject of sales, under the direction of judicial tribunals, we shall find that every court has given the most liberal construction, for the purpose of sustaining them. It is not their aim to search for informalities or defects to defeat the end of the law; but rather to search for principles and analogies, on which to sustain such proceedings, in order that the objects of the law may be answered; that those who put their confidence in courts of justice, or in those on whom courts have conferred this power, may not be misled and deluded; and in relation to deeds and the private acts of parties merely, effect is always given according to the intention if possible, *ut res magis valeat quam pereat.* Grant *v.* McLachlin, 4 Johns. Ch. 37; 4 Robt. Adm. 3, 4; Cran. 3, 16, 27; 6 Wheat. 519; 20 Johns. 705; 4 Dall. 220; 1 Dall. 352; 6 Bin. 496.

GARRARD, for the plaintiff:

This case now comes up on a motion for a new trial, predicated on the supposed error of the court in rejecting the defendant's evidence. The whole case is before the court, and the plaintiff's counsel rely on each and all of the objections taken to the defendant's title.

Lessee of Ludlow's Heirs *v.* Park.

The first objection arises on the order of 1810. The deed and order taken together show that the sale was made prior to the granting of the order. No attempt was made to show that the recital of the time of sale was erroneous. It is true *the [13 court was asked to presume that there was a mistake either in the recital of the day of sale or the date of the order. But this they declined. The records of the court supported the date of the order, and the plaintiffs offered to prove the sale to have taken place on the 13th, as recited in the deed, but the court stated it was unnecessary, because the recitals of their own title papers must be taken and held to be true until the contrary was shown. The sale thus made before the order was granted was null and void, and the order of the 17th of December could not aid the title thus acquired. The administrators had no beneficial interest in the estate. They acted merely as the agents of the law to effectuate its provisions. The law did not authorize a sale previous to the granting of the order. Their acts were, therefore, nugatory to all intents and purposes. 3 Cowen, 299.

The first question that arose on the order of 1804 was, whether the defendant, under the circumstances of the case, could rely on that order. The plaintiff's counsel insist that he is precluded by the recitals of his own title papers. The deed from the administrators recites the fact that they acted under the order of December, 1810. They looked to and relied on that order as the power to sell the land to the defendant. The argument of the counsel for the defendant proceeds on the ground that there was a misrecital, which would not conclude the defendant, and all the authorities cited are cases of misrecital where there was a full and valid power to do that which had been done. But the facts of this case do not admit the application of a rule, the correctness and justice of which are not controverted. There is no misrecital in the case. In what does the misrecital consist? The deed of the administrators recites that the sale was made on December 13, 1810. The truth of this recital is not controverted; but is confirmed by the very fact that the defendant is driven to rely on the order of 1804 to sustain the sale. The deed recites that John C. Symmes executed to the administrators a deed of trust, to be executed under the order and direction of the court of common pleas of Hamilton county. The deed of trust is before the court and verifies the recital. The deed further recites that the court of com-

mon pleas, at December, 1810, granted *them an order to sell and carry into effect the objects of the trust reposed in them by the deed from Symmes. The records are in evidence, and the recital of the deed is supported by them. Where, then, is the misrecital? There is none. The records amply testify that the administrators acted exactly as they themselves recite that they acted. There is no collision between the recitals of the deed and the records of the court. The deed recites a state of facts which is at war with a fair administration of the law and the records show a proceeding entirely null and void.

To relieve the defendant of the dilemma, thus made clear by his own title, and the records on which it is founded, his counsel attempt to shift their ground and shelter him under the order of 1804. In making out title through administrators or executors under our statute, an order is an essential prerequisite to the validity of the deed. They act merely as trustees to execute the law. They have no beneficial interest in the estate which they may be authorized to sell under the law, and their deeds stand in this respect on the footing of sheriffs' deeds.

A sheriff's deed can not be given in evidence, without a transcript of the judgment and execution. They stand in the eye of the law as the basis of the title, and without them the deed is a mere nullity. In order to test the propriety of applying the doctrine of misrecitals to the case under consideration, a case may be supposed. Land is levied on and sold under a judgment of January term of the court of common pleas of Hamilton county, in favor of A. B. against C. D.; an execution is regularly issued, and the levy made and returned—the property advertised and sold—the deed recites all these facts—the purchaser pays his money and accepts his deed. Prior to the judgment, C. D. sells his land to a *bona fide* purchaser, and executes a deed to him. Could A. B., in an action of ejectment brought by such purchaser, say that there was a misrecital in his deed, and show a judgment of a term anterior to the alienation between the same parties, under which the land might have been levied on and sold? Certainly not. The judgment and order are emphatically the foundation of such titles, and the deed is the best evidence of what judgment or order the sheriff or administrator acted under in making the sale. And when the records *furnish evidence of judgments or orders to correspond with the recitals of the deed, it precludes the idea

that other judgments or orders can be shown to support the deed, when those recited fail.

It is admitted that it was not necessary to recite the order, if the administrator was clothed with full power to sell, and that a misrecital of a valid power could not vitiate a deed otherwise properly executed within the power. 5 Cowen, 526; 10 Johns, 381; 3 Ch. Cas. 101; 9 Johns. 90. These were cases where the power referred to was a valid, subsisting power, and the misrecital was merely in the amount of the judgment or costs. Such mistakes the courts held to be immaterial, because there was a full, valid, and subsisting power, sufficiently identified by the recitals to sustain the sale and deed.

The defendant's counsel have referred the court to Comyn's Digest, title *Poair*, C. 4, and to title *Fait*, E. 1, both of which say it is unnecessary to recite the power in executing it; and that the misrecital of a valid power would not vitiate.

The cases referred to in Massachusetts reports seem to have no application to the case under consideration. The point settled in 3 Mass. 399, has never been controverted by the counsel for the plaintiff. So also in 10 Mass. 105, and 11 Mass. 227. To save time both to the counsel and the court, it is admitted to be the settled and incontrovertible law of the land, that purchasers, after a great lapse of time, will not be required to produce strict proof that administrators had taken the necessary oath, or that they had given regular notice of the time and place of sale, and especially when there is evidence that there was a sale at auction under a proper authority.

Such is also the law relative to tax sales of long standing, because it would be unreasonable, after a great lapse of time, to require of the purchaser strict proof of the regularity of tax bills, valuation warrants, notice of sale, etc.

The case in 11 Massachusetts decides what has been held to be the law of the State, time after time, by this court, and its correctness never questioned. If a court of competent jurisdiction grants an order to sell, the propriety of granting such order can never be questioned collaterally in *an action of ejectment. In such [16 action the inquiry can not extend beyond the order. But these authorities have nothing to do with the point under consideration, and would not have been noticed, had they not been cited by the

defendant's counsel, and the court referred to them as illustrative of some point of the case.

None of the authorities cited would warrant the court in applying the doctrine of misrecitals to this case. There can be no propriety in permitting the defendant to set up a power in the administrators, which they did not claim in themselves, but which they in fact disclaimed, by obtaining the order of 1810, and reciting it as the authority under which they made the sale to the defendant.

2. Admitting that the recitals of the deed did not conclude the defendant, it is contended, in the second place, that the property in dispute was excepted from the operation of the order of May, 1804.

The order excepts and reserves the farm and improved lands near Cincinnati, together with the houses and lots in Cincinnati.

The lot in controversy, as was shown by the plat of the city, recorded in 1802, is one of three out-lots of twenty-seven acres as designated in the original plan of the city. The deed from J. C. Symmes to Ludlow for the lot includes it with other lots of the city. In the deed of the administrators to the defendant, it is described as the lot in the southwest corner of Cincinnati.

The construction given by the court to this reservation, in the case of Ludlow's Heirs *v.* C. & J. Johnson, 3 Ohio, 553, is decisive of this point. The terms of the reservation must be construed as if employed in a grant. A grant of all the lots in Cincinnati would unquestionably include all the lots presented on the face of the map of Cincinnati without regard to the quantity each might contain. It would be a matter of no consequence whether the lots contained one, or one hundred acres; if they were included in the plat of the city, and so made matter of record, they were properly and strictly speaking lots of Cincinnati, and within the fair and proper reading of the reservation. But if there should be, by possibility, a doubt raised on this point of the reservation, none could exist on the other branch, which reserved *the improved lands near Cincinnati. There was full, clear, and uncontroverted proof to the jury, that a greater part of the lot had been under cultivation from 1795; and that at the time the order was granted the lot was in the possession of one Richardson, who had leased it of Ludlow in his lifetime, and occupied it for ordinary farming purposes. There was no effort made to contradict this testimony, because none could be made successfully.

3. The order of 1804 was inoperative, because the act of 1795, " for the settlement of intestates' estates," on which it was founded, was repealed. This act, it will be contended, was repealed, *first*, by the act of February, 1805, "defining the duties of executors and administrators on wills and intestates' estates;" and *secondly*, that it was repealed by the act of February 22, 1805, repealing all the laws of the territory passed or adopted prior to September 1, 1799.

The burden of the inquiry, in the examination of this question, is to ascertain what was the intention of the legislature touching the subject; and in making this inquiry, a careful review of the early legislation of the state seems necessary. The legislature of 1804–5 undertook to revise and embody into one all the statutes of the territory and state then in force relative to each particular subject of legislation. They passed a new execution law, and incorporated into it all of the provisions of former laws which they wished to retain. They added new provisions, however, which serve to characterize what was then considered the true policy of the state relative to the sale of lands for the payment of debts.

Reason and justice require that these new provisions should be made alike applicable to the whole state and to each individual, unless there should appear something in the statute-book indicative of a different intention in the legislature. Such intention, however, does not appear, upon a fair reading of that statute, taken by itself or in connection with other acts of that session. Neither individually nor collectively do they admit of a construction that would work injustice or create invidious distinction. The protective character of the newly-incorporated provisions seems to have been demanded by the exigences of the country. The state then *was, and has remained agricultural in the main, and [18 the wisdom of successive legislatures has continued in force a system which looks to the protection of the soil (the basis of the wealth and prosperity of the state) from unwarranted sacrifice. No one can look to the legislation of Ohio without seeing that this subject has never been lost sight of since the earliest stages of the government; and, with the light of experience before them, no one will question the wisdom that introduced and sustained such a system.

The intention of the legislature to revise and reduce into one act the various acts relative to the subject of administrators, their

Lessee of Ludlow's Heirs *v.* Park.

powers, duties, and responsibilities, is clearly manifested in the act of February 1, 1805, "entitled an act defining the duties of executors and administrators on wills and intestates' estates." If, then, this leading object of the legislature is kept in view, there can be no difficulty in understanding what should be the construction of the act of February 1, 1805. The leading object of that act was the settlement of intestates' estates. It points out the powers and duties of administrators from the granting of the administration to the final settlement of his accounts; but in no part of the statute is it intimated that their powers should be extended to the real estate. The general jurisdiction and power of the court of common pleas could not reach the land through the agency of administrators.

If they possessed the power to order a sale, it was in virtue of some act of legislation. The act of 1795 was the only one which had ever conferred that power; and that act, coming within the spirit and letter of the repealing clause of the act of February 1, 1805, the power derived under it ceased with the law itself. That it was the intention of the legislature to define the whole duties and powers of administrators, and to limit them to the personal estate, can scarcely admit of a reasonable doubt. If such, then, was their intention, and the language of the statute will warrant no other conclusion, the repealing clause would stand a mere nullity if the act of 1795 should be considered unrepealed. The repealing clause repeals all laws on the same subject. The leading objects of both laws was the same—the settlement of intestates' estates. The act of 1795 pointed out the duties and powers of administrators relative to the real *estate, when there was a deficit in the personal, for the payment of debts, etc. The act of 1805 stopped short of the act of 1795, and limited them to the personal estate, and to guard against their interference with the land of an intestate, they repealed all the laws on the same subject, leaving the act of 1805 as the only law for the future.

The intention of the enacting power can only be fairly drawn from the language they employ to express their intention. Had they intended, when enacting the law of 1805, to give the power to sell the real estate, it is somewhat strange that they should have used no language from which such intention could be reasonably deduced. While legislating so directly on the subject; while enacting a general revising and consolidating law, the very title of which

included the subject of the law of 1795, it seems to be a matter of impossibility that they should have intended such a power to exist for the future, and yet use no word or sentence indicative of such intention.

But aside from the repealing clause, I contend that the act of 1795 would have ceased after the passage of the act of 1805, and this, too, upon a principle that rests on a solid foundation of law as well as common sense. It is a well-settled rule of law that a subsequent statute, *revising* the *subject* matter of a former statute, and evidently intended as a substitute for it, although it contains no express words to that effect, must operate to repeal the former. Bartlett *v.* King, 12 Mass. 345.

I do not make this point merely for the purpose of swelling the number of points in the cause, but because I think it applicable to the case, and because it stands upon sound legal principles, and is supported by the best authority. Its application to this case will be made manifest by referring again to the act of 1805, taken in conjunction with the two other acts of that session bearing on the same subject. The one directing the manner of executing, proving, and recording wills and codicils, vol. iii., 173; the other directing the distribution of insolvent estates, vol. iii., 182. These three laws remained in force till June, 1808, when the subject matter of each was embodied into one law, and for the first time under the state government the power to sell lands by administrators was added. These three laws were then held *and regarded [20 as the only laws in force on the subject, and they are repealed by express reference to each. It can not be said that the legislature intended that the act of 1795 should stand in connection with these three laws as parts of an entire system, and that it remained in force with them till 1808, because at this same session they passed the general repealing law (which will be hereafter considered) that repealed the act of 1795. Upon the whole, therefore, I contend that the act of 1795 was repealed by the act of February 1, 1805, and that the order of May, 1804, ceased to have any operative effect after June 1, 1805.

In the second place, I contend that the act of 1795 was repealed by the general repealing law of February 22, 1805, vol. iii., 294. Section 1 of this act repeals all the laws adopted by the governor and judges prior to September 1, 1799. This court, in the case of Ludlow's Heirs *v.* C. & J. Johnson, 3 Ohio, 553, have decided that

this law repealed the act of 1795, and that from this time to June 1, 1808, there was no law authorizing administrators to sell the land of an intestate.

This opinion of the court is decisive of the case under consideration, so far as it depends on the general repealing law, unless there is something in the saving clause to vary the case. By the saving clause it is provided "that nothing in this act contained shall be construed so as to effect, in any manner, any suit or prosecution now pending and undetermined; but the same shall be carried on to judgment and execution, agreeable to the provisions of any of the said laws, under which the suit or prosecution may have been commenced, and the practice of the courts."

Upon this cause the defendant's counsel rely to support the order of May, 1804, as a living, subsisting power, under and in virtue of which the deed to the defendant can be sustained. They contend that the order of 1804, when once granted, was properly a suit or prosecution within the meaning of the terms of the saving clause. In deciding this question we must again look for the intention of the legislature; and in conducting this inquiry, how shall their language be construed? Shall we apply to it the ordinary rules of interpretation? Shall we give to the words "suit and prosecution," which were to be carried on to final judgment and *execution, their usual import when used in statutes; or shall their meaning be strained and molded to suit the circumstances of a desperate case? Does the case call for a deviation from the fixed and settled rules of construction? If it does not, the language of the clause furnishes a conclusive answer to the attempt that is made to extend its meaning to embrace the unexecuted and extinguished order of May, 1804. What are the facts? The administrators obtained an order to sell lands while the act of 1795 was in force. Under that order a part of the estate was sold. In 1805 the law was repealed. In 1808 the legislature passed a law authorizing administrators to sell lands under certain restrictions and on certain conditions. In 1810, while this law is in full force and recognized, and regarded as the rule of property, the administrators sold a part of the real estate. The heirs contest the validity of the sale, and allege that it was in direct violation of the laws of the land. How are they answered? Is it by showing that the sale was fair, *bona fide*, and consistent with the law under which it was made? No. They abandon the

order of 1810, and treat the act of 1810 as a mere nullity, and ask. the court to enter into all their nice and hair-breadth distinctions,. the end and drift of which are to defeat the plainest and most explicit declarations of the legislature. They ask the court to revive and continue in force, for their special benefit, a law which had been repealed five years and a half prior to the time of sale. And the language of the saving clause is the pretext under which they ask the court to sink the character of honest, enlightened, and independent expounders of the law, who alone look for the intention of the legislature, regardless of the consequences that may result from the malpractices of others, and assume that of a quibbling. Jesuit, whose self-interest knows not the rights of others, nor re gards the obligations even of a solemn oath.

The repeal is not to affect any "suit or prosecution then pending and undetermined." In using this language could it possibly have entered into the minds of the legislature, that at the end of twenty-five years it might be wrested to mean what the court are now asked to declare its true import? Could they have had in view to save such a case, and found no better language to express their intention? Such intention *can not be gathered from [22 the language employed without the most gross violation of the true import of the words taken separately, or in their connection. What is a suit? In the case of Cohens *v.* Virginia, the chief justice of the United States thus defines it: "We understand it to be the prosecution or pursuit of some claim, demand, or request In law language, it is the prosecution of some demand in a court of justice. The remedy for every species of wrong, says Judge Blackstone, is, the being put in possession of that right, whereof the party injured is deprived. A suit is defined in the mirror to be the lawful demand of one's right, or as Bracton and Fleta have it, in the language of Justinian, "*jus prosequen di in judicio quod alicui debetur.*" To commence suit is to demand something by the institution of process in a court of justice; and to prosecute a suit,. is according to the common acceptation of language to continue that demand." Let this definition, thus drawn from the highest sources of jurisprudence, be applied to the language of the saving clause, and see how far the order of 1804 falls within it. If the order of 1804 was a suit, who were the parties? Who was plaintiff, claimant, complainant or demandant, and who the defendant? In some one of these characters a demand was made, if there was

a suit. But who appeared to make a demand? By what description of process was the demand commenced? Against whom was the demand made? How and in what manner was that demand pending, and for whose benefit was it prosecuting? It can not be said that the administrators were plaintiffs, because if in this transaction they are entitled to either character, it is properly that of defendant, of whom the creditors were making a demand.

It is manifest, however, that the language of the statute can not be made to embrace the order of 1804. Suits and prosecutions, in the proper legitimate signification of those terms, were what the legislature intended to save, and nothing else.

There are, however, other terms in the subsequent part of the clause, which are wholly inconsistent with the application of the term *suit* or *prosecution* to the order of 1804. It provides that the suit or prosecution shall be carried on to "final judgment and execution." If there was a suit pending and undetermined, within the meaning of those terms, *may it not be asked, when was the judgment rendered thereon? What was the nature and extent of that judgment, and against whom was it rendered? If the judgment followed the nature of the action, how was it rendered? Was it in debt, case, assumpsit, or in some other form of action known to the law? The statute not only required them to be carried on to final judgment, but also to execution. Against whom was the execution issued in that case? What was the command of the execution? Did it direct the officer of the court, who rendered the judgment, to take goods, lands, or the body. This analysis of the language of the act exhibits in a strong light the gross and ridiculous absurdities that await the forced and unheard of construction the court are asked to give to the saving clause. The granting of the order is the only act done throughout the whole proceeding that can be assimilated to a judgment, and this was done more than a year prior to the repeal of the law. The court had no further judgment to give in the matter. The order, when granted, was the end of their jurisdiction under the law, so far as related to the creation of the power to sell. They could neither recall, alter, nor modify the power after it was granted. The moment that the order was made, the administrators had the power to proceed and sell. They looked to the law as their guide in the sale of the real estate, and upon that they had to rely as the authority to sell.

Many difficulties are removed by a correct understanding of the real source whence flows the authority to sell. I maintain that the law is the source of the power, and not the order. It is true that the order is an essential prerequisite to the exercise of the power. But the order itself looks back to the law for all the force and effect that it has in the sale of an intestates 'estate. In granting the order of 1804, the court acted merely as the instrument of the law. It was confided to them to say in what cases, and when, a sale of the real estate was necessary. The order of the court was nothing more than a declaration that there was a necessity to sell the real estate, according to the provisions of the law of 1795.

This declaration having been made by the court, the administrators were authorized by the law to proceed and sell, not in virtue of any power given by the order, but in virtue *of the [24 law under certain circumstances, of which the order was evidence. The order of 1804 stands on the records to this day, and is full evidence now of what it was then, that there was a deficiency of the personal estate, and a necessity for selling the real, as required by the provisions of the law of 1795 ; and if the argument for the defendant is correct, it is a full and vaild power, under which the administrator could, at this day, proceed and sell the remainder of the estate, although the law of 1795 has been repealed upward of twenty years, upon which it was founded, and in virtue of which it alone had effect. The order taken *"per se"* stands as it has always done—complete evidence that there was a case made which authorized the court to grant it. But when taken in connection with the law under which it was granted and viewed as an authority to sell the lands, it remains on the records a dead letter since June, 1805. The law was the foundation whence flowed the authority to sell, and while the law remained in force, the administrators could, within a reasonable time, call that power into operation, as was decided by the Supreme Court of the United States, in the case of Ricard *v.* Williams. If, therefore, the language of the saving clause precludes the construction attempted to be given so contrary to all analogy, and the common use of language, no good and substantial reason can be shown why the court should do such violence to the manifest will of the legislature. No new or original proceeding could be commenced under any one of those laws embraced in the repealing act; and where no act had been done by the administrators toward a sale, where no third person had ac-

quired rights under a due execution of the order, the effect of the law was to stop all matters where they were. It is manifest that the law did not contemplate the sale of real estate by administrators from June, 1805, till June, 1808. The law was so regarded throughout the state, with the exceptions of the sales made of Ludlow's estate in 1805. Those sales this court have decided to be void, and they add, " that it is manifest there was a time when this description of property could not be appropriated for this purpose through the agency of administrators."

But there is another view of the subject, which, to my mind, 25] presents an insuperable objection to the order of 1804, *as attempted to be used. Suppose that the authority to sell under that order did not cease with the act of 1795, upon which it was based, but survived the repeal of that law, the question then arises, how was this authority to be executed ? I now put the question on the ground that the power to sell was still in full force and effect, either because the legislature did not intend to take it away, or because they could not. For the sake of illustration it may be placed on either or both. Was the power to be executed with reference to the provisions of the act of 1795, upon which it was founded, or the act of 1810, which was in force at the time of the sale ?

If it was a living and valid power to sell the land, it was such in virtue of the act of 1795, because the act of 1810 prescribed a rule for future cases only, and did not contemplate the execution of powers already in existence. If, therefore, the power is sustained in virtue of the act of 1795, it seems to follow as a matter of conseqence that it should be executed with a reference to the provisions of that law. So that the legitimate result of the whole doctrine is, that because the order was granted in 1804, when the act of 1795 was in force, it therefore clothed them with a power which not only survived the repeal of the law on which it was founded, but which they could execute regardless of subsequent legislation on the subject.

If the order of 1804 did survive the repeal of the act of 1795, and can be sustained to the extent contended for in this case, it must be upon the naked ground that the legislature had neither the power to repeal nor modify the law, so as to affect the order after it was granted ; because there is nothing in the acts of the legislature of 1804–5, from which it can be reasonably inferred that they intended

to give to the repealing laws of that session such an interpretation. The councils of the state would enact laws to but little purpose, if their power to repeal or modify existing laws should thus be circumscribed, or their acts be expounded in open hostility to their obvious intention.   If the execution of the power is to be tested by the act of 1795, it then stands on the records of the court a perpetual and never-ending power ; a power which alike disregards the repeal of the act of 1795, and the provisions of the act of 1810, which was demanded by the exigencies of the country.   Such a construction *of the powers of the legislature, I apprehend, will not   [**26** be given by this court.

The execution of the power can not be sustained under the provisions of the act of 1810.   This court, in the case of Cowper and Parker *v.* Wills, 1 Ohio, 124, declare that a title to land in Ohio, derived through the agency of executors or administrators, must be made out under the law ; that the law is the instrument creating the power to sell, and the deed of the executor or administrator, the instrument executing that power, and that the validity of the latter will depend upon its compliance with the terms, conditions, and limitations of the former.   Let this rule of law, which is founded on the soundest and most salutary principles, be taken as the test of the case under consideration.   If the law be the instrument creating the power to sell in this case, what was it ?   The act of 1795 was the instrument creating the order of 1804, and under it the power should be executed if the rule was complied with in full. But suppose the law of 1810 to be the one under the provisions of which this sale is to be measured, have its terms and conditions been complied with by the administrators ?

By section 31, it is provided in what cases and under what circumstances a sale of the real estate shall be made.   Section 32 provides that when the court of common pleas shall be satisfied that a sale of the real estate is necessary, as provided in section 31, "That they shall appoint three disinterested men to view the lands, tenements, and hereditaments so to be sold, and return to the court a valuation thereof under oath ; after which the court shall direct the executor or administrator to proceed to sell the whole or a part (as they may think proper) of such real estate, after giving notice of the time and place of sale by advertising the same in at least five public places in the county, or in some newspaper of the most general circulation in the county, for at least six weeks successively,

and such lands, tenements and hereditaments shall be sold, provided that any such tracts of land, with the improvements thereon,. do not sell for less than two-thirds, and any tract without improvements, for less than one-half of its appraised value." This section of the law bears materially on the question now under consideration. How does the sale comport with this *section? Where is the evidence that one single requisite of this section has been complied with? I say of this section, because if they could show the proceedings of the court of common pleas in compliance with this section, the plaintiff would not be permitted to go behind the order to inquire whether the provisions of section 31 had been complied with. All the requisites of section 31 stand on the face of the order "*res adjudicata.*" Those were matters confided to the discretion of the court, and when that discretion has been exercised by a grant of the order, they must be taken and held as matters adjudged.

But when the case is viewed with reference to section 32, it stands wholly unsupported in a single point. The records of the court of common pleas, so far from furnishing evidence that the requisitions of the statute had been complied with, prove directly the reverse. They show, incontrovertibly, a total disregard of the most essential and indispensable provisions of the statute. The very first step to be taken by the court, after they were satisfied that a sale was necessary, has been disregarded. Where is the evidence that appraisers were appointed? Who were they? When, and by whom were they sworn? When did they make their return to the court? What was the appraised value of the premises? The records of the court furnish no light by which a favorable answer can be given to any one of these questions. But their silence on this subject furnishes a strong answer against the defendant. Not only the letter, but the spirit of the statute required the intervention of appraisers. Their ·valuation was as indispensable, under the act of 1810, as the order itself. The order could not stand without it, because without it the grant. of the order would be "*coram non judice.*" The whole ·power of the court was derived from the statute. Their jurisdiction of the particular subject was not general, but limited. Any act, therefore, beyond the provisions of the law, would be null and void. Tiernan *v.* Beam, 2 Ohio, 383.

The appraisement was not only an indispensable prerequisite,

to the granting of the order, but when granted, was a part of the power, or rather a condition annexed to the power by the statute, which could not be disregarded in its execution. In this view of the subject, it does not stand, as has \*been supposed, on the [28 footing of sales under execution. This court, in the case of Allen *v.* Parish, 3 Ohio, 135, decided that the appraisement was not a condition precedent attached to the authority of the sheriff to sell, but that the statute was merely directory.

If the sheriff neglected or refused to do his duty in this respect, the law attached a heavy penalty, and afforded to the defendant in the execution ample means to avoid injury. The defendant could on the return of the proceedings to the court, make his objections to their irregularity, and have them set aside; or he could pursue the remedy given by the statute in a summary way, for the malfeasance of the officer. This remedy was not only ample for the party injured, but was, in itself, a sure guaranty that the sheriff would do his duty under the provisions of the statute.

The substantial basis of this decision of the court is, that the defendant, in the execution, is a party to the whole proceeding, and that every reasonable opportunity is afforded him to protect his rights before the final consummation of the title by the payment of the money and the execution of the deed, and even after this he had his remedy under the statute, or he could pursue his action against the sheriff for malfeasance in office.

The reason of this decision can not apply to this case. What remedy had the heirs of Ludlow, under the act of 1810, for a neglect to appoint appraisers? Against whom did the remedy lie? Not against the administrators, because it was not their duty, and surely it would be a new doctrine that would turn them over to sue the court of common pleas for neglect of their official duty. They are not, however, without redress. Their remedy is the one which they are now pursuing. They look to their estate, and assert their right to recover and hold it against those who pretend to have acquired title, in violation, not only of the letter, but of the spirit and essence of the statute under which their title is said to be derived. The heirs were neither parties nor privies to the act of the administrators. They could not call on the court to have appraisers appointed. They were not before the court, nor did the law make any provision whereby they could be brought there, to direct or even assent to the proceedings of the court.

29] They had no opportunity *afforded them to arrest the pro-
ceedings of the administrators, from the filing of their petition to
the final consummation of the title.    The court themselves had no
right to review the sale and put their veto on it, even if it should
have been conducted with a total disregard of the law.    Ad-
mitting that an appraisement had been made and returned, if the
counsel for the defendant are correct, the statute was merely di-
rectory to the administrators, and the sale would be sustained, al-
though the land may not have been sold for one-tenth of its ap-
praised value,   But this position is untenable.    It is at war with
the policy of the law, and at once destroys all the checks and
guards which the law had enacted to secure the rights of minors.
The appraisement was a condition in the power to sell.    The law
could not authorize a sale on any other terms.    It was an indis-
pensable condition in the power, and beyond it the law would be
no warrant for the sale.    If the appraised value was bid, as re-
quired by the statute, a sale could be made, otherwise nothing
could be done.    The law was a good and sufficient authority for
all their acts, while they were acting within its requisitions, but
the moment that they went beyond the law their acts were null
and void, and their deed conveyed nothing.    Tiernan v. Beam, 2
Ohio, 383.    The facilities afforded by the execution law for redress,
where the sheriff neglects or refuses to do his duty, are not given
in the case of administrators.    Putting the case upon the ground
that the heirs had recourse against the administrators, it was still
in their power to reply that there was no appraisement made, and
that it was not their duty to have one made and returned; that
they had executed the power given them fairly and honestly, and
that the land had sold for a good price.    This reply might be
made with great propriety and justice, and yet not one requisition
of the act of 1810 be complied with.    The fact that such a reply
could be made, shows that the whole proceeding was " coram non
judice," unless there was an appraisement, and if there was one,
it constitutes a limitation and condition on the power to sell,
which could not be disregarded in its execution.

But the defendant's counsel, ever fruitful of ingenuity when
30] pressed by the necessity of their cause, have an argument *at
hand by which their case is extricated from difficulty, and they
urge it on the court with their usual zeal.

They say that, at this distance of time, the court will presume

24

all to have been correctly done which the law required, and to this point some of the authorities cited from Massachusetts reports are supposed to apply.

The principles settled by those authorities, as was before remarked, will be admitted to their fullest extent, but they bear not the most distant analogy to the case they are cited to support. It is insisted by the counsel for the defendant, that the court shall presume the appointment of appraisers. But upon what ground is this presumption to be made? So far from the record furnishing evidence upon which this presumption can be made, it presents a state of facts wholly inconsistent with it. It shows that the filing of the petition and the granting of the order was done at one and the same time. The court are asked to presume that the appraisers were sworn, but nothing is shown from which it can fairly be inferred. If they could show a valuation returned and filed agreeable to the statute, it would then be fair and reasonable to presume the administration of the oath. But the valuation is also to be supplied by presumption. Thus the court are asked to presume everything which was necessary to confer the power on the court of common pleas to make the order; because I contend that, under the act of 1810, the court had no power or authority to grant the order without a valuation made and returned; and that the records of the court should furnish evidence of the fact. The records are the best evidence that the nature of the case admits. What do they show? That a petition was filed on December 17, 1810, and that the order was granted at the same time. The whole record is in these words: "December 17, 1810. Petition of the administrators of Israel Ludlow, deceased, etc., for to sell real estate to satisfy the demands, etc., which this court grant." Upon this record the court are asked to say that it is fair and legitimate to presume that all the prerequisites of the statute to the granting the order were complied with. This application is attempted to be supported by the application of a class of cases, which, though they stand somewhat allied to it, do, nevertheless, rest upon an entirely different basis. The distinction which I take between those *cases where an order, or decree, is con- [31 clusive, and where it is not, I think well founded in reason and supported by the current of authorities. It is a distinction which the court may adopt without violating any sound rule of law. It is this: That where a court in their character as such, and not

depending on contingencies, have the power and authority to make the order or decree sought to be impeached, and where it was submitted to their sound discretion to grant or not to grant the prayer of the petition or bill, the order of decree is conclusive that the court had such facts before them as in the exercise of their discretion would warrant the order or decree. But where the power and authority of the court to make the order or decree is dependent upon the performance of certain acts, which it was not discretionary with them to do or not to do, as they might think proper, and of the performance of which the records should furnish evidence, the order or decree is neither "*prima facie*" nor conclusive evidence of the performance of such acts. The order, as it stands upon the records of the court of common pleas, would properly be taken and held as conclusive, that the court had such a case made before them by the administrators, as is required by section 31 of the act of 1810, and such as would have authorized them to have taken the proper and regular steps under section 32 to grant the order. But it furnishes no evidence that the provisions of that section were complied with, which necessarily preceded the final grant of the order. The records of the court should furnish evidence that the appraisers were appointed, that they were sworn, that they made a valuation, and that it was returned to the court prior to the granting of the order. But we are told, in reply, that the court will presume them to have been lost or mislaid. Where will the doctrine of presumption end? The appointment of the appraisers, the administration of the oath, and the appraisement, are first to be presumed. The record of these facts is then presumed into existence; and when we ask for the record, it is then presumed to be lost or destroyed, and thus by presumption they create and destroy, to suit the extremities of a desperate cause. Admitting the order should be considered proof conclusive that there was a strict compliance with the law, in all 32] that was done by the court, how is *the amount of the appraisement to be ascertained? In the execution of the order, when properly granted, the amount of the valuation was a matter of vital importance. This, too, is supplied by the omnipotent power of presumption, and the court are again asked to indulge this convenient principle, and presume that the sale was made for a proper proportion of the presumed amount of a presumed valuation.

Lessee of Ludlow's Heirs *v.* Park.

Upon the whole, then, I consider the sale inoperative and void. The order of 1810 was subsequent to the sale, and the administrators having acted under that order were concluded from relying on the order of 1804. The premises in dispute, being a town lot, and improved, was excluded from the operation of the order of 1804, as decided in the case of the Johnsons. The order ceased with the repeal of the act of 1795, on June 1, 1805. The defendant's title can only be sustained under the order of 1804, in virtue of the act of 1795, upon the broad and unconditional admission that the order conferred a perpetual power on the administrators, which the legislature had not the authority either to alter or destroy. Such an admission, to even the smallest extent of time after the law of 1795 was repealed, can only be justified on one of two propositions; either that the creditors of Ludlow, by a tacit stipulation, made the remedial laws of the state a part of their contracts; or that by his death they, somehow or other, acquired a vested right to have their debts collected under the then existing remedial laws. Upon one or both of these propositions the conclusion must rest. They are both fallacious and untenable, as was most conclusively and triumphantly shown in the case of Ogden *v.* Saunders, Wheaton, by the chief justice of the United States. If either of these propositions had been viewed favorably by men of talents and reputation as sound and learned jurists, previous to the decision of that case, it is certain that since then they have been regarded as things that were, but that are now no more. They were then stripped of that plausible garb which ingenuity and sophistry had thrown around them, and their pretensions to sound legal principles forever silenced. The principles asserted, defended, and established by that opinion of the chief justice, are the same which this court had recognized and acted on in the case of McCormick *v.* Alexander, 2 Ohio, 65.

*The same propositions were argued before this court in the [33 case of the Johnsons, and were argued with no less zeal than ingenuity, by gentlemen of high legal reputation. The court then gave them, what they must ever do, their decided disapprobation, as sound or practical principles of law. But if, on the other hand, the sale is placed on the order of 1804, in virtue of the act of 1810, the defendant has failed to make a case. As it stands, upon their own showing, the whole proceeding was "*coram non judice.*"

The case stated, and the single abstract question argued by the

counsel for Park, is not the case that was presented, argued, and decided, at the last term of the Supreme Court, and by them reserved on this motion. The court never were called on to decide the abstract question of law, whether the recital of the deed concluded the defendant from showing and relying on any other order. No such question arose. None such was argued by us, and none such was decided by the court. When the defendant offered the order of 1804, we did make that question with the others as stated in this argument. They were all argued at one and the same time—they were not presented to the court separately, nor was their opinion given on them separately. The question whether the premises was a town lot or improved land within the meaning of the reservation, was argued at length, and upon both these points the court gave a decided opinion in favor of the plaintiff in the ejectment. To show that it was a town lot, the book from the recorder's office, containing the original plat of the town, was introduced, and was laying on the table before the court when they gave their opinion.

N. WRIGHT, in reply:

It is argued with much earnestness, that the question argued by defendants is a mere abstract proposition. In my view of the case, this position is unfounded. There is a wide difference between the effect of an item of evidence, when received, and the competency of that item. It may be of itself entirely insufficient to sustain the title of the party, and still be competent evidence as an item for that purpose. Had this case been submitted to the 34] court on the *whole evidence of both parties, the court would be called on to decide on the effect and sufficiency of the whole; or if the case had been presented to the jury fully by both parties and directions given to find a verdict for one, with leave to the other to move for a new trial on the whole case, the effect and sufficiency would be called in question. But such is not the case, as I understand it. The motion for a new trial, so far as this matter is called in question, is made because an item of evidence is overruled; the decision complained of was, that the evidence was incompetent. The order of 1804 (perhaps others, it is immaterial), was offered and overruled as being incompetent; now if the recital of another order precluded us from showing that of 1804, the latter was clearly incompetent; but if it did not so preclude us, it was

not incompetent, however insufficient it might be of itself to sustain our title. It is argued that the land in dispute is within the exception contained in that order; but whether within the exception or not, is matter of fact for the jury to decide, and on that ground it certainly was not incompetent. If the jury should find it to be within the exception, it would of course be insufficient to sustain our title; but before they can so find, the order must be before them.

It is also argued that the law under which this order was made, had been repealed, and thereby the order was canceled. Suppose we admit for a moment this extraordinary doctrine; does it follow. of course that this order was incompetent as an item of evidence ! No testimony can be said to be immaterial, which, upon any sup. posable state of facts, applicable to the case, could legally influence the finding of the jury. Can it be said that the order of 1804, although of itself insufficient to sustain our title, could not be con· nected with any other evidence, so as to become material? That no subsequent acts of the court, referring to, predicated upon, or recognizing that order, could exist, so as to render that order ma terial in the case? Here we are met with the opposite statements that such orders were not proved. Perhaps not, and they could not be, nor even offered under the decision of the court, the order being decided incompetent on the ground of the recital. The op posite counsel have brought this difficulty on themselves by the *course they have chosen to pursue. Instead of putting the [35 case into a shape to present the whole testimony on a motion for a new trial, they have chosen to object to an item of evidence; the item is overruled as incompetent because of the recital; they now attempt to sustain themselves by showing that it was immaterial Does not every lawyer know, that the materiality of evidence is a very different thing from its incompetency on other grounds; that to judge of the materiality, reference must be had to the whole facts of the case; and, therefore, where the incompetency is estab· lished in such a way as to shut out some of the facts, that the ma- teriality can not be fairly judged of. If a witness be called, and the testimony he is to give be stated, and he is then excluded on the score of interest, on which the party is obliged to abandon his case, would the party be allowed, on a motion for a new trial, on the ground that this witness was excluded, to abandon the question of interest, and argue that the testimony offered by him was immaterial? or would the court tell him, we have prevented the·

party from developing his case, and we must know more of it, be fore we can say whether or not the testimony is immaterial.

In the case before the court, it is perfectly plain, that the decis- ion on the trial must produce the same effect. The order is ob- jected to, and is overruled, because it is not recited in the deed. In that view of it, the court can not look into other evidence to show its materiality, the counsel can not offer evidence for that purpose, for such becomes perfectly immaterial under the decision. This has no resemblance to the case as suggested by the other side, of a wrong reason given for a right decision; for it is not the rea- son given, but the facts on which the decision is to be predicated, that are different.

The mere fact that this order was excluded on the ground of the misrecital, precludes the possibility of the facts being so presented as to enable the court to judge of the materiality. We are told, on the other side, that great injustice will be done, by confining the case to this point; that if they can sustain the verdict upon any grounds whatever, it must be done to end the litigation. Mark what these plaintiffs call justice! On the trial a decision is made upon one point, which operates to exclude all our evidence; and, therefore, *though that point was wrongly decided, we must still be condemned on the evidence as given, without the opportu- nity of having the benefit of what might be given under the cor- rected decision; because by an error of the court we have but half made out our case, therefore we must be tried upon that half. This all inevitably results from the single fact, that the order was ex- cluded upon the mere ground in question; that is, it was over- ruled on a ground which did not admit an examination into the other facts; it was simply rejected as incompetent, the course se- lected by the opposite counsel was not one to bring the whole facts before the court on this motion; and however much they may have been talked about by counsel on the trial or in argument, they are not before them on a fair view of the case.

Such was my view of this point, and some of the considerations, which I supposed influenced his honor to restrict our argument to the single point. If I am mistaken in the law, and have misap- prehended the judge, so it must be. But these cases seem to me to be hard enough on the defendants, in justice and good conscience, without their being deprived of the fullest and fairest trial. When I discovered the misunderstanding, it was too late to do any sort

of justice to the question on the effect of the repealing law upon this order; a question involving so much property, and on which other suits are pending in the courts, could not in justice be argued without more investigation. And there is quite as much reason to say, that there is an attempt here to obtain a premature and incidental decision of that important question, as for several remarks that have been made.

In relation to the exception contained in the order, I do not and have not considered that a very material matter. It is really a question of fact, and if decided against us on the trial, it is clearly shown that we ought to have a new trial for the evidence since discovered.

It is attempted to make a distinction in relation to the recital of an order, between this case and the case cited; that these are merely some mistake in the description, and this a case where one order is acted upon, and another offered in evidence.

In answer to this, in the first place, it is purely a matter of fact under which order the sale was made. No orders were *in [37 fact issued; the administrators acted by virtue of the entries on the minutes of the court, to which no additional validity could have been given by procuring the clerk to make a certified copy. It was therefore a matter which we claim a right to prove, that we actually sold under the old order; but the effect of the decision of the court was to preclude us from such evidence; they decided that the order itself could not be shown, because not recited; of course they excluded all evidence of a sale in fact made under that order. I trust the gentleman will not insist that this case was taken from the jury by the court on a question of fact, whether or not the sale was really made under the order of 1804.

But again, concede the administrators really supposed they were acting under the order of 1810. This would not help the plaintiffs. In this particular these orders have no resemblance to executions. An execution confers particular power to do particular acts, under a particular judgment. Even then, if the sheriff should hold two executions, and should sell on executions generally, without declaring which, and should recite one in his deed, which did not cover the property, it would not estop him from showing the other. A case much more analagous is this : I hold two powers of attorney, and execute a deed reciting that power, which does not cover the land; does it estop me from proving the other power,

Lessee of Ludlow's Heirs v. Park.

which does cover it? If the cases be examined, they will be found to go thus far; if a man has several powers, or several modes of making a conveyance, etc., and adopt one, and recite one, and suppose he is acting under one, which finally proves ineffectual, the law will resort to the other, without any regard to his intention, and make the act effectual.

[In consequence of the great length of the arguments of Messrs. WRIGHT and GARRARD, those of Mr. HAMMOND, and of Messrs. CASWELL and STARR, are omitted.]

Opinion of the court, by Judge HITCHCOCK:

The practice of the court requires that, when a cause is reserved for decision at the special session, a statement shall be made in writing, and filed with the papers in the cause, *showing the particular point or points to be litigated and determined. If the question reserved, arises upon the sufficiency of the pleading, such statement is unnecessary. Nor is it required in chancery proceedings, where the evidence is in writing, and with the pleading submitted to the court. But where the court is supposed to have erred in the admission or rejection of evidence in the course of a jury trial, which supposed error is made the foundation of a motion for a new trial; or where the court, in the course of such trial, reserves questions for subsequent consideration, such statement is peculiarly necessary. Without it, it may many times be difficult to arrive at a satisfactory conclusion. The statement should be drawn up by the counsel excepting to the opinion of the court, submitted to and approved by the court, and filed away by the clerk. This having been done, no room is left for subsequent altercation. The propriety and necessity of this course of practice is clearly evinced in the present case. No statement in writing was made, consequently the counsel differ as to the precise question reserved. Contrary statements are exhibited with a view to satisfy the court as to this point. From our knowledge of the gentlemen concerned, we have not the least doubt but that they state the circumstances as they understood them when these circumstances transpired, but it is manifest there must have been some misapprehension.

The case now comes before the court on motion for a new trial. The motion is grounded upon a supposed error in the court upon the circuit, in the rejection of certain evidence offered by the de-

fendant; and upon the fact that the defendant, since the trial, has discovered evidence material to the issue. Other reasons are assigned in the record, but they do not appear to be relied upon, not being even referred to in argument.

On the trial of the cause to the jury, the defendant offered in evidence a deed to himself, from the administrators of Israel Ludlow, purporting to convey the premises in controversy. The deed bears date December 21, 1810, and recites the fact that the sale was made on the 13th day of the same month. At the same time the order of sale of December 17, 1810, was offered in evidence to show the power of the administrators to sell. *The re- [39 cital of the deed states that the sale was made in pursuance of this order. The evidence thus offered was objected to by the counsel for the plaintiff, the objection sustained, and the evidence overruled. In rejecting this evidence the court decided correctly, unless the doctrine can be maintained that an order of the court of common pleas, authorizing an administrator to sell the real estate of his intestate, will have so far a retrospective operation as to legalize a sale made prior in point of time to the order itself. An attempt will hardly be made to sustain a principle so absurd. In fact, I do not understand that there is any complaint in consequence of the rejection by the court of this order.

The defendant next offered in evidence the order made by the court of common pleas, at the May term, 1804. This evidence was objected to for a variety of reasons. It was urged that inasmuch as it appeared from the recital in the deed, that the administrators, in making the sale, and the defendant in purchasing, looked to the order of 1810, he should be concluded by it, and could not show any other order conferring authority upon the administrators to sell. It was further urged that the order of May, 1804, did not embrace the premises in dispute, and if it did, then that that order ceased to operate from and after the repeal of the law of 1795, "for the settlement of intestates' estates." The court sustained the objection, and overruled the evidence. In deciding the question, an opinion was expressed that the defendant, by the recital in his deed, must be precluded from giving in evidence any other order than that of December, 1810.

Counsel for the defendant contend, that the case was reserved, not so much for the purpose of determining whether this evidence was properly rejected, as for the purpose of determining whether

the opinion thus expressed is consistent with law; and insist that if it is not, a new trial should be granted. On the other hand, it is insisted for the plaintiff, that the whole case is before the court, and if, for either cause assigned, the evidence ought to have been rejected, then that the motion for a new trial should be overruled. From the recollection of the judge who presided at the trial, as well as from the nature of the case, we are induced to believe that the counsel for the defendant must have misunderstood the court. 40] In the trial of a cause, a particular *item of evidence is offered, and objected to for a variety of reasons, one or more of which are sufficient to show that the evidence is improper. The court, in assigning reasons for the rejection of the testimony, express an opinion upon some one point, which can not be sustained upon legal principles   It is unreasonable, it is contrary to every day's experience to suppose that, upon a motion for a new trial, the court will confine themselves to the consideration of the opinion thus expressed. The only proper inquiry in such case is, was the evidence properly rejected, and that without regard to the particular reasons assigned by the court when it was rejected. Any other course would lead to manifest injustice. It would be trifling with the rights of the parties.

We come now to the consideration of the question, whether the court mistook the law in refusing to admit the order of May, 1804, in evidence. That order is in these words: " The administrators of the estate of Israel Ludlow, deceased, exhibit an account current, and pray the court to issue an order for the sale of the real property to defray the debts due from the estate, etc. John Ludlow and James Findlay sworn in court. The court order so much of the real property sold as will meet the said demands, except the farm and improved lands near Cincinnati, together with the house and lots in Cincinnati." In offering this evidence, the defendant could have no other object in view, than to sustain his title, by showing an authority in the administrators to make sale of the premises in dispute. The administrators might have had authority to sell all the real property of the intestate, with the exception of this identical land, and it could avail them nothing. The object to be effected by the sale is expressed in the order. It was to enable the administrators to pay the debts due from the estate. It is true the amount of those debts is not stated, yet the order is general to sell " so much of the real property " as will

" meet the said demands."   No specific property is referred to as
that which shall be sold, but all the real property, " except the
farm and improved lands near Cincinnati, together with the house
and lots in Cincinnati," are in effect subjected to sale.   It would
seem that there could be no difference of opinion with respect to
the construction to be put upon this order; that there could be
no doubt with respect to the property to be *sold, or with   [4]
respect to that exempted from sale.   It is of the same import it ·
would have been, if couched in these words :  " The court order so
much of the real property sold as will meet the said demands;
provided, the administrators shall not be permitted to sell the
farm and improved lands near Cincinnati, nor the house and lots
in Cincinnati."   The " farm and improved lands," as well as the
" house and lots," are exempted from sale.   Such is the manifest
intention, and such the construction which would be put upon it
by any individual examining the order itself, without being in-
fluenced by any controversy connected with it.   Ingenuity of
counsel may possibly enable them to give it some other construc-
tion; but the court must collect the intention of the tribunal from
which it emanated, by giving to the words and terms used their
usual and appropriate signification.   Will it be said it was the in-
tention of the court to authorize the sale of " the house and lots,"
or of all the " improved lands " except the farm, or of such " lots "
as were not improved ?   Before I can be satisfied of this, I must
be satisfied that the court did not understand the meaning of
language.   The " house and lots," the " improved lands," the ·
" lots " whether improved or not improved, are real property. ⸍
The administrators are authorized to sell the whole real property,
exclusive of that saved by the exception, and after having given
this general authority, it is not to be credited that the court would
proceed to specify " the house and lots," etc.   But for the excep-
tion, these would have been condemned to sale; by it they are
exempted.            ⸜                              ⸍
     The same construction was put upon this order in the case of
the Heirs of Israel. Ludlow *v.* C. and J. Johnston, 3 Ohio, 578.
That case was repeatedly argued, having been before the court for
years.   Every point necessary to decide the case was fully con-
sidered, and after much deliberation determined ; and the decision
upon each point fully concurred in by all the members of the
court present when the case was finally disposed of.   It may not

Lessee of Ludlow's Heirs v. Park.

be improper to say further that the court as at present composed are fully satisfied with the decision of that case. Such being the fact, we shall do nothing to disturb in any one particular the principles there settled.

42] *This construction being put upon the order of May, 1804, it is necessary to consider whether that order would be competent evidence to prove, or as conducing to prove, an authority in the administrators to sell a lot or "lots in," or "the farm and improved lands near Cincinnati." It is argued that although the order might have been insufficient to sustain the defendant's title, still it was competent evidence. Why? Because it is said there might by possibility have been some other evidence offered to show its relevancy. Such 'other evidence was not offered, and not having been offered, we are not to presume its existence; the legitimate presumption is, that it does not exist. At any rate, the court must decide upon what was, not upon what might have been offered. Testimony irrelevant to the matter in issue is incompetent. Proof of power to sell one tract of land, no more conduces to prove a power to sell another than proof of the sale of one tract conduces to prove the sale of another. The court from which the order in question emanated, could not confer a greater authority upon the administrators of Ludlow, to dispose of his real estate, than what Ludlow himself might have conferred, in his lifetime, upon an agent, by letter of attorney. No one will contend that an authority given to an agent to sell one tract of land authorizes him to sell another. Suppose Israel Ludlow in his lifetime, owning lands in the counties of Warren and Hamilton, had made an attorney authorizing him to sell his lands in Hamilton. The attorney, in virtue of this order, would most assuredly have no right to interfere with the lands in Warren. But suppose he had sold lands in Warren, and controversy should now arise between the heirs of Ludlow and the purchaser. Will it be said that the power of attorney authorizing the sale of the Hamilton lands would be competent evidence to prove, or as conducing to prove, an authority to sell the lands in Warren, and consequently to sustain the title of the purchaser? To my mind it is most clear it would not. So far as respects the Warren lands, the power of attorney would be a dead letter. It would be the same as if no such power had ever been made. It would have no relevancy to the matter in controversy, of course would be incompetent evidence.

I should as soon as think, upon a question respecting the title to land in Hamilton county, of receiving in evidence a deed conveying *land in a different county, there being in no shape or [43 manner any allusion, in the deed offered, to the land in controversy.

The same principle must apply to the order of May, 1804. In virtue of that order, the administrators of Ludlow claimed the authority to sell, and did sell, certain lands. In that order no allusion is made to "the farm and improved lands near Cincinnati," nor to the "lots in Cincinnati," any further than to exempt them from sale. And it would be strange that this order should be received in evidence to prove an authority to do an act which it expressly provided should not be done. If, then, the premises in controversy are within the exception contained in the order, as construed by the court, the evidence was properly overruled, being irrelevant to the matter in dispute.

Whether the premises are within the exception remains to be considered. And here it may not be improper to remark that in determining whether the court erred in rejecting the evidence, we must take the case as then presented, without reference to the evidence said to have been newly discovered. Most, if not all the towns which have been laid out in this state, have been surveyed into in and out-lots, both, however, being considered as constituting parts of the town. On December 6, 1800, the general assembly of the territory passed a law "providing for recording town plats," requiring, among other things, that the map or plat to be recorded, should "set forth and describe" the lots intended for sale by their progressive numbers, etc. In practicing under this law, it has ever been the custom to "set forth and describe" both in and out-lots upon the recorded plat. In pursuance of the provisions of this law, the town plat of Cincinnati was recorded. At an early period, town property was withdrawn from taxation for state purposes, and subjected to taxation for county purposes. In levying the county tax, both in and out-lots were by statute made liable. All these circumstances go to show that, by our policy, out as well as in-lots have been, and are to be, considered as lots in town. An authority to sell lots in town would authorize the sale of either kind. An exemption of lots in town from sale would exempt either kind. When this cause was in trial to the jury, the recorded plat of Cincinnati was before the court. Upon that plat

37 .

**44]**  the premises in controversy are *"set down and described" as an out-lot in the town. In truth it did not appear to be controverted that such was the fact. It was so considered by the court, and correctly, according to the evidence then before them. The premises then being a lot "*in*" Cincinnati, and within the exception of the order of May, 1804, that order did not authorize the administrators of Ludlow to make sale of this land; on the contrary, it, in effect, prohibited such sale. It is irrelevant to the matter in controversy between these parties, consequently incompetent evidence, and was properly rejected by the court.

Whether the opinion incidentally expressed by the court, as to the effect of the recital in the defendant's deed, was or was not correct, we do not undertake to determine. It is unnecessary inasmuch, as for the reasons already assigned, the evidence was properly rejected. Nor shall we express an opinion as to the effect of the repeal of the law of 1795, upon the order of 1804. This presents an important question, and as we are informed that much property depends upon its determination, we are the more anxious to hear every argument which can be urged, before it shall finally be decided.

I now come to the consideration of the motion as founded upon the discovery of new and material evidence. Motions for new trials are addressed to the discretion of the court, and unless founded upon some supposed error of the court, will be granted or refused, as the justice of the case may seem to require. A jury may decide against strict law, or against the weight of evidence, and still substantial justice may have been done. Under such circumstances a court would be unwilling to disturb their verdict. When the motion is grounded upon the discovery of new and material evidence, our practice requires that newly discovered evidence should be disclosed. This is required that the court may be enabled to form an opinion, whether, by the introduction of such evidence, a different verdict ought to be obtained. In considering the motion, the court will not inquire, whether, taking the newly discovered evidence in connection with that exhibited on the trial, a jury might be induced to give a different verdict, but whether the legitimate effect of such evidence would be to require a different verdict. In the **45]** trial of issues in fact, the court judge of *the competency, the jury of the credibility and effect of testimony. But after verdict, when the motion for a new trial is considered, the court must judge

38

not only of the competency, but of the effect of evidence. If, with the newly discovered evidence before them, a jury ought to have come to the same conclusion they have done, it would be worse than useless to grant a new trial. The effect would be to add to the expense of the litigation, and delay parties in obtaining their rights. On the trial of this cause, the evidence showed the premises in controversy to be a "lot in Cincinnati." The design in introducing the new evidence is to prove that such is not the fact. But would the legitimate effect of this evidence be to require a different verdict? The premises, if not " in," are certainly near Cincinnati. On the trial they were proved to have been improved prior to the date of the order of May, 1804. By the terms of that order, "improved lands near," as well as "lots in" Cincinnati, are exempted from sale. The introduction of the newly discovered evidence, therefore, taken in connection with that exhibited on the trial, could not avail to sustain the defendant's title. There would be the same want of evidence to show an authority in the administrators to make sale of the premises. It would be useless, therefore, to have a new trial.

The motion is overruled, and judgment must be entered on the verdict.